## Case No. 15,633.

### UNITED STATES v. LOUISVILLE & P. CANAL CO.

[4 Dill. 601; 1 Flip. 260; 1 Cent. Law J. 101.] [1]

Circuit Court, D. Kentucky. Sept. 3, 1873.

FEDERAL COURT PRACTICE — POWER OF A JUSTICE OF THE SUPREME COURT TO ACT OUT OF THE CIRCUIT TO WHICH HE IS ASSIGNED — CANAL COMPANY — THE RIGHTS OF BONDHOLDERS, THE GOVERNMENT, AND THE GENERAL PUBLIC.

1. Where the judge of the district court for the district in which a bill in equity is brought, and the circuit judge for the circuit, and the justice of the supreme court allotted to that circuit, are all absent from the district and circuit, another justice of the supreme court has

jurisdiction. at any place in the United States, to hear an application for an injunction, notwithstanding the act of congress of June 1, 1872. See Rev. St. § 719 [17 Stat. 196].

2. The legislative history of the Louisville & Portland Canal Company from its first incorporation by Kentucky, in 1825, down to the present, and its relation to the government of the United States. given by Mr. Justice Miller, who holds that the corporation is still in existence, and has the right to use and control the canal and its revenues so far as may be necessary for the purposes contemplated by the act of the legislature of Kentucky and the joint resolution of the two houses of congress of May 24, 1860.

3. The United States is the only stockholder in the company. and its directors are naked trustees without an interest; and, under the state and federal legislation concerning the canal and the bonds issued to raise money to enlarge and improve it, secured by a mortgage of the revenues and tolls of the canal company, there are three parties interested in the trust and the manner in which its duties shall be discharged by the company: (1) The bondholders of the company; (2) the government of the United States. sole stockholder, and which has expended $1,000,000 upon the canal; and (3) the general public.

[Cited in brief in Poland v. Lamoille V. R. Co., 52 Vt. 158.]

4. The appropriation act of congress of June 10. 1872 [17 Stat. 347]. in relation to the canal, construed so as not to impair the rights of the bondholders and the opinion expressed that congress could not abolish or so limit the tolls as injuriously to affect them. "for the plain reason that it would be a legislative attempt to destroy vested rights, and a taking of private property for public use without due compensation."

5. Under the circumstances of the case, the president and directors of the canal company were enjoined. at the suit of the United States, from interfering with its engineer officers and contractors in the prosecution of the work of repairing and improving the canal.

[This was an application at the suit of the United States to enjoin the president and directors of the canal company from interfering with the United States engineer officers and contractors in the work of improving and repairing the canal.] [2]

G. C. Wharton, for the United States.
James Speed, for defendant.

MILLER, Circuit Justice. Upon a bill in chancery directed to the judges of the circuit court of the United States for the district of Kentucky. an application is made to me at Long Branch. in the state of New Jersey, to enjoin the Louisville & Portland Canal Company from interfering with the engineer officers of the United States, and the person with whom they have contracted for the work of making certain repairs and improvements in said canal, under authority of an act of congress appropriating money for that purpose, approved June 10, 1872. An affidavit of the attorneys of the United States accompanies the application, which shows that the judge of the district court for that district, the judge of the circuit court of that circuit, and the justice of the supreme court allotted to

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge. and by William Searcy Flippin, Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 4 Dill. 601, and the statement is from 1 Flip. 260.]

[2] [From 1 Flip. 260.]

that circuit, are all absent from and without the district and circuit. I am of the opinion, therefore, that, notwithstanding the provisions of the seventh section of the act to further the administration of justice, approved June 1, 1872 (see Rev. St. § 719), I have jurisdiction to hear the motion, and that it is my duty to do so.

The language of the act under which the agents of the government are proceeding is important. It is found in the act "making appropriations for the repair, preservation, and completion of certain public works on rivers and harbors, and for other purposes," and is, verbatim, as follows: "For the continuing the work on the canal at the falls of the Ohio river, three hundred thousand dollars. And the secretary of war is hereby directed to report to congress, at its next session, or sooner, if practicable, the condition of said canal, and the provisions necessary to relieve the same from encumbrance, with a view to such legislation as will render the same free to commerce at the earliest practicable period. subject only to such tolls as may be necessary for the superintendence and repair thereof, which shall not, after the passage of this act, exceed five cents per ton."

A brief reference to the history of this canal, and its relations to the government of the United States, is essential to an understanding of the matter now presented for consideration. By an act of the Kentucky legislature of January 12, 1825, a corporation was chartered, by the name of the Louisville & Portland Canal Company, to construct a canal around the falls of the Ohio river, with a capital stock of six hundred thousand dollars, divided into shares of one hundred dollars each, with the right to levy tolls on vessels passing through the canal. By subsequent statutes the capital was increased to ten thousand shares, and the United States, under acts of congress, became the owner of twenty-nine hundred and ten of said shares. The canal was constructed, and has ever since been in successful and profitable operation; and the tolls collected under the limit of the charter granted by the state yielded such a revenue, beyond what was necessary to keep the canal in repair, that, by the joint legislation of the state and the United States, and by the consent of the individual corporators, a plan was adopted and entered upon to make the canal free to the uses of commerce, except so far as might be necessary to keep it in repair. This plan was inaugurated by an act of the Kentucky legislature, passed in 1842, the provisions of which were accepted by the stockholders, including the United States. Its essential features were that the surplus revenues of the corporation should be used to buy up all the stock held by others than the United States, and that when this should be accomplished the canal should be transferred to the control of the government for the use of the public, subject only to such tolls as might be necessary for its superintendence and repair. This plan

was so far carried out that in the year 1855 all the shares other than those held by the United States had been purchased in, except five shares left purposely in the hands of as many individuals, to qualify them to hold office as directors of the corporation.

But while this process of extinguishing the individual shares had been going on, it became clear that the demands of commerce required an enlargement of the canal and a change in its place of lower outlet, which could only be made by an additional or branch canal. The successful use of the tolls in buying up the shares of private stockholders, pointed at once to the means of making this increase in the capacity of the canal without burdening either the state or federal government; and, by statute of the Kentucky legislature of 1857, and joint resolution of the two houses of congress of 1860, the canal company was authorized to do this work, and to borrow money for that purpose, and pledge the faith of the company and its tolls or revenues for the money so borrowed. The corporation accordingly issued its bonds for $1,-600,000, secured by a mortgage on the canal, its franchises. and its tolls and revenues; and proceeded to expend the sum realized on these bonds in the enlargement and improvement of the canal. It proved, however, that when this money was all expended the canal was still unfinished; and the congress of the United States, in the year 1868, commenced a series of appropriations for the purpose of completing the work, which has been continued to the present time. Over $900,000 have thus been appropriated and expended under the control and direction of the officers of the government, and the appropriation of 1872, already referred to, was in continuation of this work.

During this time the president and directors of the Portland Canal Company and the officers of the United States seem to have acted in harmony, the corporation collecting the tolls and paying for and superintending the temporary repairs. They have also paid the interest on the debt, and redeemed or bought in about half a million in amount of the bonds. This harmony would probably have continued but for the clause in the present act of appropriation, that, "after the passage of this act, the tolls should not exceed five cents per ton." It is the first time that congress has attempted to regulate or limit the tolls to be collected on vessels using the canal. The rate thus limited would not produce enough to make the ordinary and necessary repairs, and pay for the superintendence of the canal. It would leave the interest on the bonds unpaid, and largely impair, if not destroy, the security of the bondholders for the payment of the principal.

The president and directors of the company construe the act as appropriating the money on the condition that the tolls shall be limited to five cents per ton, and they say that an acceptance of the appropriation would be an

implied consent to this limitation. They, therefore, notified the officer in charge that they refused to accept the appropriation. That officer. however, proceeded to let the work and commence operations, and the corporation interfered by physical force to prevent it, and I am now asked by the bill before me, filed in behalf of the United States, to enjoin the corporation from this interference.

The officers of the canal company maintain: (1) That the corporation is the legal owner of the canal, and that neither the government of the United States nor any one else has the right to assume such control of its property, as the action of the engineer officers seek to do, without the consent of the directors of the company; and (2) that a due regard to their duty to the bondholders and other creditors of the corporation forbids them from giving either express consent, or such consent as inaction would imply, to the assumption of the United States to reduce the tolls found in the appropriation act.

The United States, by its counsel, on the other hand, maintain that since the year 1855 the corporation has had no existence as such, or, if it has any existence, it is merely a nominal one, as the agent of the government, for whose sole use it is kept alive; and that as the government owns practically all the stock, it has, and should have, the right to control the use, and direct the changes and improvements in the canal. This view is supposed to receive additional force from the powers and duties of the national government in regard to the navigable waters of the United States.

The first, and perhaps the most important, question to be determined, is the relation of the corporation and its officers to the possession and control of the canal. The proposition of the government counsel is based upon the idea that when, under the act of 1842, all the private stock had been bought, the government became, without other action, the owner, and entitled to the possession and control of the canal; and that, both by operation of that statute and the necessity of the case, the corporation ceased to have an existence, or at least to have any right or title to the canal; and this argument is made stronger, in the opinion of counsel, by the circumstance that at that time, to-wit, on the 31st day of January, 1855, by a report to the secretary of the treasury, the directors advised him of the purchase of private stock, and the readiness of the corporation to transfer the custody of the canal to the United States so soon as the department was prepared to receive it. But it does not appear that the department was ready to receive the transfer. Certainly no formal act, either of congress or of the department, accepting this transfer or acknowledging the obligation on which alone it was to be so transferred, namely, to hold it for the use of the public free of tolls except so much as might be necessary for its superintendence and repair, is shown or claimed. On the contrary, in reply to the notification of the company, the secretary requested them to continue their organization by retaining a share of stock for each director to maintain his eligibility as such, and to manage the affairs of the canal as heretofore.

But whatever doubt may exist as to the precise relations of these officers to the work at that time, is removed by the subsequent act of 1857 of the state legislature, and the joint resolution of congress of 1860. These have already been referred to, as authorizing the company to extend and enlarge the canal, and to contract a debt for that purpose; but as the language of the joint resolution of congress, approved May 24, 1860, seems to me to be conclusive of the continued existence of the corporation, I will give its precise terms. It was resolved: "That the president and directors of the Louisville & Portland Canal Company be, and they are hereby, authorized, with the revenues and credits of the company, to enlarge the said canal, and to construct a branch canal from a suitable point on the south side of the present canal to a point in the Ohio river opposite Sand Island, sufficient to pass the largest class of vessels navigating the Ohio river." The resolution had two provisos—one protecting the United States from liability for the debt so incurred, and the other declaring that when the work was completed, and paid for, no more tolls should afterwards be collected than were necessary to keep it in repair, and pay for its superintendence and management.

This resolution, beyond all controversy, clearly recognizes three facts of important bearing on the matter in hand: (1) The existence of the corporation called the Louisville & Portland Canal Company; (2) that it had revenues and credits which might be sufficient to enable it to raise means for this large and expensive work; (3) that it had the right, or it was then given, so far as the United States could give it, to use these credits and revenues for that purpose. It is inconceivable that this company had any other revenue than the tolls from the canal, or any other credit than that which arose from the right to these tolls, and the ownership or control of the canal. To me it seems that this is conclusive of the existence of the corporation. and of its right to use and control the canal and its revenues, so far as was necessary for the purpose contemplated by the act of the Kentucky legislature and the joint resolution of the two houses of congress.

But, while these considerations prove the continued existence of the corporation, the validity of the contract by which they pledged the canal and its revenues for the money borrowed for its extension, and its duty to secure and protect this revenue, and to do all that lawfully may be done to prevent its

destruction or diversion from that purpose, it is still true that the directors of this corporation occupy a very peculiar position, and one widely different from the directors of railroads, insurance companies, and other corporations for private gain. The United States is the only stockholder of this corporation. The directors have really no personal interest in the corporation or its property. They are to all purposes what equity calls trustees without an interest—the depositaries of a naked trust. For whom do they hold this trust, and for whose benefit must they exercise it? This inquiry, though lying at the foundation of the question to be solved here, is, fortunately, not a difficult one. There are three parties interested deeply in this trust, and in the manner in which its duties shall be discharged, which I review in the order of the superiority of their claims, rather than their importance: (1) The holders of the bonds, secured by the mortgage, authorized and placed under a two-fold legislative sanction by the legislature of Kentucky and the congress of the United States; (2) the United States, the holder of all the stock in the corporation, expending a million of dollars beside, for the benefit of the canal; and (3) the public—the community—to whose use, free of all charges but those necessary to keep it in operation, it has been solemnly dedicated by the legislature of Kentucky, by the congress of the United States, and by the action of the corporation itself, as well as by all the acts of all these parties from 1842 to the present time, so soon as the enlargement is completed, and the debt thereby created discharged.

As regards the first of these, I have no hesitation in expressing my entire conviction that the bondholders have a lien upon the revenues of the canal, and a right to insist that the corporation shall protect these revenues to the extent necessary to make entirely safe the payment of their debt and its accruing interest; and that, until that debt is paid, or the mortgage satisfied, or otherwise discharged, with the consent of these bondholders, this right of theirs remains, with the corresponding duty of the directors of the corporation. But the right of these creditors is limited to this; and so long as their security is unimpaired, it is the duty of directors to advance the other interests I have mentioned, for which they are trustees. The interests of the United States and of the public are, for present purposes, identical. The government has, in all its actions, shown its desire and its intent that, at the earliest moment, the public use of the canal should be freed from all burdens save those necessary for its repair and management; and her very act which has given rise to the present opposition of the president and directors, is wholly in the interest of the public, and designed to hasten the end long contemplated by all parties.

Now, if the act of the United States in completing the enlargement of the canal is an act for the benefit of all these parties, the bondholders inclusive, the resistance of the president and directors is an act in detriment of their trust, injurious to all the interests confided to them, and a mere arbitrary exercise of power which should be restrained. If, on the other hand, any one of those interests would be seriously prejudiced, they should not be disturbed in the exercise of a reasonable discretion in the protection of that interest.

That the work itself which is being done by the government is a useful and a necessary work for the public good, and for that of the United States, as a stockholder, and as the representative of the public, is undeniable. That it also adds to the value of the security of the bondholder, and is to that extent in his interest, is equally clear. But, in regard to the latter, if, as alleged by defendant, the work is being constructed in a manner which so far obstructs the use of the canal as to endanger the revenue from which this interest is to be paid; or if, as the trustees seem to believe, the work, when completed under the present act of congress, will extinguish the right of the corporation to collect sufficient tolls to pay both principal and interest of their debt—then the work should not be done, for these rights are paramount.

In regard to the manner of doing the work, the affidavits submitted satisfy me that no such serious obstruction to the use of the canal, or to the repairs which the directors wish to make, will result from the work as that claimed by the defendant—none which should be set up for a moment in comparison with the great value to all parties of the vigorous prosecution and early completion of the work of extension and enlargement. But I am satisfied that the president and directors are honest in their belief that an acquiescence on their part in the expenditure of this appropriation on the canal would bind them legally, as an acknowledgment of the government limitation of the tolls—an acknowledgment which would be a violation of their official duty. Of this result they will be rid, if their action is controlled by a competent court against their protest. To refrain from disturbing the contractors and engineers in expending this money, when their hands are tied by an injunction, raises no presumption of acquiescence in the claim of the government to reduce the tolls to a minimum.

Should the court so restrain? Or, if they are right in their construction of the statute, should they be permitted to resist congressional interference in this matter? This leads me to a remark or two on the construction of the appropriation act. The first sentence is a distinct and clear appropriation of $300,000 for the continuation of the work in which the government had for several

years been engaged, and in which it had spent, aside from its stock, near a million of dollars. The subsequent sentence directs the secretary of war to report to congress what legislation is necessary to relieve the canal of encumbrance, so that it may be free from all other tolls than what is required for its management and repair; and this sentence declares that such tolls, after the passage of this act, shall not exceed five cents per ton. That the appropriation is absolute, and independent of the clause concerning tolls, I have no doubt. It might as well be argued that it was dependent on the report of the secretary of war. Whether, therefore, the tolls be reduced or not, the appropriation remains, and should be carried into effect. When we consider that the next sentence recognizes the encumbrance on the canal—no doubt meaning the one in favor of the bondholders, so often mentioned in this opinion—and directs an inquiry as to what action by congress is necessary to remove it, I can hardly believe that, in the same sentence, it was intended to destroy the essential thing on which that encumbrance rested—namely, the tolls. The argument is, therefore, not without force, that congress meant, when they said such tolls should not exceed five cents per ton after the passage of this act—such act as they contemplated in future to pass—to satisfy or remove that encumbrance. It must be confessed that the language is not apt for this construction; that, in their caution, the directors might well have supposed that congress intended to limit the tolls at once to five cents per ton. If this construction of the statute be correct, then I have no hesitation in saying that that part of it which so limits the tolls is void, for the plain reason that it is a legislative attempt to destroy vested rights, and a taking of private property for public use without due compensation. I think I have shown that the prosecution of this work is for the benefit and advantage of all concerned; that it does not seriously interfere with the ordinary use of the canal; and that the accomplishment of the work will neither confer on congress the right to regulate the tolls, nor validate the attempt already made to do so, if congress really intended to make such an attempt.

Under these circumstances, I have no hesitation in controlling the president and directors of the canal company in the exercise of the great trust committed to them, so far as may be necessary to permit this work to go on; and, in exercising this control, I feel satisfied that I am relieving them from an embarrassment and responsibility which they will gladly rest on the shoulders of the court. The injunction will be granted.

Ordered accordingly.

NOTE. A marked feature in the foregoing opinion is the favorable light in which it regards the rights of the bondholders of the corporation,

the learned justice declaring with emphasis that even congress could not limit the tolls of the canal, pledged for their benefit, so as to impair their rights. In England, parliament would possess this power, as shown by the case of Brown v. Mayor, etc., of City of London (1861) 9 C. B. (N. S.) 726. There a statute discharged the liability of the city of London on bonds payable out of tolls and duties levied on vessels navigating the Thames; and it was held that no action would thereafter lie against the corporation thereon, on the principle that where the performance of an obligation has been rendered impossible by act of the law, the obligation is discharged. See, also, City of St. Louis v. Sheilds, 52 Mo. 351; Dill. Mun. Corp. (2d Ed.) § 41 et seq. note.

As to the right of the United States to bring an injunction bill in the proper circuit court, to protect improvements which she is making under the authority of congress, in navigable waters, from injury which will be caused by acts done by state authority, see U. S. v. Duluth [Case No. 15,001]; sequel to same case, Wisconsin v. Duluth [Id. 17,902].

